**FILED**

MAY 2 1 2003



# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH DAKOTA

## SOUTHERN DIVISION

| | | |
|---|---|---|
| Judy Delonga, | ) | File No.: *03-4145* |
| Plaintiff, | ) | |
| vs | ) | |
| Diocese of Sioux Falls, | ) | |
| | ) | |
| Robert J. Carlson, the Roman Catholic Bishop for the  Diocese of Sioux Falls, | ) | |
| | ) | **COMPLAINT** |
| Fr. Paul v. Dudley, former Bishop for the Diocese of Sioux Falls, | ) | |
| Archdiocese of Milwaukee, | ) | |
| The Roman Catholic Bishop for the Archdiocese of Milwaukee, | ) | |
| | ) | |
| and | ) | |
| Father Bruce MacArthur, | ) | |
| Defendants. | ) | |

## JURISDICTION

(1) Plaintiff is an adult female who is a resident of the State of Florida and was a minor at the time of the sexual abuse alleged herein.

(2)  At all times material to the Complaint, defendant Diocese of Sioux Falls was and continues to be a non-profit religious corporation, authorized to conduct business and conducting business under the laws of the State of South Dakota, with its principal place of business at 523 North Duluth Avenue, Sioux Falls, SD 57104-2714.

(3)  The chief operating officer and Ordinary of defendant Diocese of Sioux Falls, the Bishop of Sioux Falls Diocese, is appointed by the Pope and has ultimate authority and responsibility for the training, ordination, placement, and, if appropriate, the discipline, removal and recommendation for laicization of all Roman Catholic priests ordained in the Diocese of Sioux Falls.  Upon ordination, each and every priest of defendant Diocese of Sioux Falls vows obedience to the Bishop of South Dakota and his successors.  The Bishop of Sioux Falls also possesses individual responsibility for the care and supervision of each and every parish, and its members, located within the area that geographically compromises the Diocese of Sioux Falls.

(4)  At all times material to the Complaint, Defendant Archdiocese of Milwaukee was and continues to be a non-profit religious corporation, authorized to conduct business and conducting business under the laws of the State of Wisconsin, with its principal place of business at 3501 South Lake Drive, P.O. Box 070912, Milwaukee, WI 53207.

(5)  The chief operating officer and Ordinary of defendant Archdiocese of Milwaukee, the Bishop of Milwaukee Diocese, is appointed by the Pope and has ultimate authority and responsibility for the training, ordination, placement, and, if appropriate, the discipline, removal and recommendation for laicization of all Roman catholic priests ordained in the Diocese of Milwaukee.  Upon ordination, each and every priest of defendant Milwaukee vows obedience to the Bishop of Milwaukee and his successors.  The Bishop of Milwaukee also possesses individual responsibility for the care and supervision of each and every parish, and its members,

2

located within the area that geographically compromises the Diocese of Milwaukee and all priests serving within the geographical limits fo the Diocese.

(6)  At all times material, defendant Bruce MacArthur (hereinafter "MacArthur") was a Roman Catholic priest ordained in and remaining under the supervision and control of defendant Sioux Falls.  From approximately 1965 through 1970, defendant MacArthur was, contemporaneously, under the supervision and control of defendant Diocese of Milwaukee serving as a priest and chaplain at St. Joseph's Hospital, Beaver Dam, Wisconsin.  He presently resides in El Paso, Texas and Gallup, New Mexico.

(7)  Jurisdiction in this Court is proper under 28 USCA 1332 because of complete diversity and because the amount of the damages exceeds the amount of $75,000.  Venue is proper in this Court under  28 USCA 1391(a)(2) as a substantial part of the events or omissions giving rise to the claim occurred in South Dakota.

## FACTS

(8)  In 1953, defendant MacArthur was ordained as a Roman Catholic priest by the Diocese of Sioux Falls.  At that time, defendant MacArthur took a vow of obedience to the Bishop of the Diocese of Sioux Falls, the Most Reverend Bishop William Brady and his successors and was under his supervision and control until 1956.

(9)  Upon information and belief, Defendant MacArthur served in several places throughout the Diocese of Sioux Falls from approximately 1954 to 1967:

a.  Between approximately 1954 and 1956, defendant MacArthur was assigned by Bishop Lambert A. Hoch of the Diocese of Sioux Falls to serve as a priest at St. Lawrence in Milbank, South Dakota.

b.  Between approximately 1956 and 1958, defendant MacArthur was assigned by the Bishop Hoch of the Diocese of Sioux Falls  to serve as a priest at Sacred Heart in Yankton, South Dakota.

3

c. Between approximately 1958 and 1959, defendant MacArthur was assigned by the Bishop Hoch of the Diocese of Sioux Falls to serve at the Catholic University of America in Washington, D.C.

d. Between approximately 1960 and 1961, defendant MacArthur was assigned by the Bishop Hoch of the Diocese of Sioux Falls to serve at the state hospital in Yankton, South Dakota.

e. Between approximately 1981 and 1963, defendant MacArthur was assigned by the Bishop Hoch of the Diocese of Sioux Falls to serve as a priest at St. Peter the Apostle in Platte, South Dakota.

f. Between approximately 1964, defendant MacArthur was assigned by the Bishop Hoch of the Diocese of Sioux Falls to serve as a priest at St. Williams at Ramona, South Dakota.

g. In 1966, defendant was assigned by the Bishop of the Diocese of Sioux Falls on duty outside the diocese.

h. Between approximately 1966 and 1970, defendant MacArthur was assigned by the Bishop Hoch of the Diocese of Sioux Falls as a priest at St. Joseph's Hospital in Beaver Dam, Wisconsin with the permission of Auxiliary Bishop Atkeileski and the then-presiding Archbishop of the Archdiocese of Milwaukee.

i. Between approximately 1970 and 1971, defendant MacArthur was assigned by the Bishop Hoch of the Diocese of Sioux Falls as a priest at St. John De Britto in Britton, South Dakota.

j. Between approximately 1972 and 1973, defendant MacArthur was assigned by the Bishop Hoch of the Diocese of Sioux Falls as a priest at St. Boniface in Seneca, South Dakota.

k. Between approximately 1974 and 1977, defendant MacArthur was assigned by the Bishop Hoch of the Diocese of Sioux Falls as a priest at St. Patrick's Cathedral in El Paso, TX.

l. Between approximately 1978 and 1980, defendant MacArthur was assigned by Bishop Paul V. Dudley of the Diocese of Sioux Falls on duty outside the diocese.

m. Between approximately 1980 and 1985, defendant MacArthur was assigned by Bishop Dudley on duty outside the diocese in San Antonio, Texas.

n. Between approximately 1985 and 1993, defendant MacArthur was assigned by Bishop Dudley on duty outside the diocese in Brownsville, Texas.

o. In approximately 1995, defendant MacArthur was permitted to retire but remains a priest of the Diocese of Sioux Falls.

p. At some point prior to his retirement, defendant MacArthur was assigned by the Diocese of Sioux Falls to serve as a priest in Africa.

(10) In 1963, the Diocese of Sioux Falls was notified of a "problem" involving sexual misconduct with a minor by defendant MacArthur. After learning this, Bishop Hoch, then Bishop of Sioux Falls, discussed the issue of sexual abuse of children with defendant MacArthur. Believing that defendant MacArthur had a problem with sexual misconduct, Bishop Hoch sent defendant MacArthur to Via Coeli, New Mexico. Via Coeli was then a treatment facility operated by the Servants of Paracletes where priests with sexual abusive behaviors were sent for treatment by bishops across the United States. After defendant MacArthur returned from Via Coeli, Bishop Hoch reassigned defendant MacArthur to St. William's Church in Ramona, South Dakota.

(11) Shortly after this reassignment to St. William's, Bishop Hoch was notified of another incident involving defendant MacArthur's sexual misconduct. Rather than reporting defendant MacArthur's criminal misconduct to local law enforcement authorities, commencing laicization proceedings or canonically removing defendant MacArthur faculties to operate as a Roman Catholic priest, the Bishop again sought to transfer defendant MacArthur to another parish.

(12) In a letter dated February 28, 1965, Bishop Hoch wrote to Auxiliary Bishop Atkeileski, the Auxiliary Bishop of defendant Diocese of Milwaukee, about defendant MacArthur as follows: "During the summer of 1963 I was alerted to his problem. He told me

5

his story, quite frankly I believed, and I sent him to Via Coeli for some months. Then I re-assigned him to another parish and all went well until a few weeks ago when I was alerted to a recurrence of the same problem. I relieved him of the parish and sent him to Blue Cloud Abbey in our diocese...". Bishop Hoch also asked "for any help you can give me and Father MacArthur in our present dilemma. If you cannot find a place for him in Milwaukee, I will be also grateful for any suggestion you may care to give me."

(13)    On or about March 5,1965, Auxiliary Bishop Atkeileski responded to Bishop Hoch's letter and offered Defendant MacArthur a position at defendant Diocese of Milwaukee's parish of St. Therese. Defendant MacArthur then served as a pastor at St. Therese and St. Joseph's Hospital in the Archdiocese of Milwaukee.

(14) In approximately May of 1965, Bishop Hoch wrote to defendant MacArthur and notified him that he was being transferred to defendant Diocese of Milwaukee: "I am sure that you know the situation here [Sioux Falls] better than I and thus you may plan an extended stay in the Archdiocese of Milwaukee. I am sure that you will need professional assistance for considerable time."

(15)    Despite the fact that both dioceses had learned of defendant MacArthur's propensity for sexual misconduct and abuse, that his propensity to be a danger to his parishioners persisted even with psychiatric treatment, the defendant dioceses transferred and permitted defendant MacArthur to serve in a parish where they knew or should have known that he was a great risk to continue to sexually molest youth like plaintiff.

(16)    Plaintiff was raised in a devout Roman Catholic family, was baptized, and confirmed in the Roman Catholic Church. In approximately Fall of 1965 when Plaintiff was approximately 10 years old, she was hospitalized at St. Joseph's Hospital for a gastrointestinal condition. During her stay at St. Joseph's, she and her family were attended to by defendant MacArthur who had been assigned by the defendant Dioceses as the hospital chaplain, priest and spiritual advisor. During this time, Plaintiff and her family came to know, trust, revere, obey and admire defendant MacArthur as a priest and a spiritual advisor. Honored and impressed with the

6

interest that defendant MacArthur paid to both plaintiff and her family, defendant MacArthur was invited into their family home for dinner, birthday celebrations and other special events.

(17) From approximately 1965 to 1970, defendant MacArthur regularly and repeatedly sexually molested Plaintiff. This abuse began while Plaintiff was approximately 10 years old during her stay in the hospital. Thereafter, defendant MacArthur continued to abuse Plaintiff in several areas including, defendant MacArthur's residence located right next to the hospital and during a trip to Key West that defendant MacArthur had invited Plaintiff and her family to take with him. The abuse of Plaintiff continued after defendant MacArthur left defendant Diocese of Milwaukee and returned to the defendant Diocese of Sioux Falls.

(18) In April of 1970, the Bishop of Sioux Falls informed defendant MacArthur that he could come back and serve in the diocese of Sioux Falls, stating: "My first interest will be to help you. If your problems are behind you, I see no reason why you should not return and be well accepted by both Bishop-Clergy and People. However, if you have any type of mind-set for another locale for your ministry, we shall not make ourselves difficult." Shortly thereafter, defendant MacArthur returned to defendant Diocese of Sioux Falls.

(19) In the summer of 1970, defendant MacArthur invited Plaintiff and some friends to visit him in Sioux Falls. During that trip, defendant MacArthur abused Plaintiff.

(20) In the Fall of 1970, defendant MacArthur sexually abused Plaintiff for the last time at a motel near Beaver Dam, Wisconsin and for several years thereafter continued to follow Plaintiff, coming to her home and observing her at a high school event.

(21) During the period of time defendant MacArthur abused Plaintiff, he also emotionally and spiritually abused her, convincing her that his conduct was not wrong, and told her that the sexual abuse and related relationship was "our secret," degraded her if she couldn't meet with him and on one occasion, when the Plaintiff was approximately 14 years old, called Plaintiff a "slut" because she spoke with another boy. Defendant MacArthur also required Plaintiff to lie to her parents as to her whereabouts when she was with him and was able to deceive, manipulate and control the Plaintiff by reason of his position as a priest.

7

(22) Despite the earlier reports of inappropriate behavior, defendant MacArthur's own admissions, defendant MacArthur's psychiatric treatment and his recidivism after treatment, the defendant Dioceses and allowed defendant MacArthur to continue serving as a priest without warning to the Plaintiff, the public, parishioners, police or prosecutors so that he had access to victimize Plaintiff and others, including:

a. On or about February 4, 1978, defendant MacArthur was indicted by an El Paso County Grand Jury for rape of a physically disabled hospital patient;

b. Despite this criminal indictment, subsequent incarceration and the longstanding documented history of defendant MacArthur's dangerous behavior, on or about June 15, 1981, Bishop Dudley, Bishop of defendant Diocese of Sioux Falls, encouraged another transfer for defendant MacArthur, this time to a Mexican Mission, stating: "I am pleased, Bruce, that you are interested in working in the Mexican Missions. I am sure you will make a great contribution. We have two groups of Sisters from Presentation, Aberdeen, who are now serving in different parts of Mexico. It would indeed be an honor for the diocese to have you also serve these beautiful people."

c. On or about May 2, 1990, Bishop Dudley continued to encourage the transfer of defendant MacArthur and the concealment of defendant MacArthur's history by writing to the Bishop of the Diocese of San Angelo, Texas with representations and assurances that MacArthur was in good standing with the Diocese of Sioux Falls and fit to act as a priest, as follows: "Bruce is in good standing with the Diocese of Sioux Falls. . .. Because of previous difficulties in our small diocese, it was a mutual decision that Bruce seek ministry outside of South Dakota.... You know his background far better than even I do. It is my understanding that he has sought extensive counseling in dealing with the sexual issues that has afflicted him in the past. He left our diocese about 17 years ago. My first contact with Bruce was ... in 1978 when I arrived in Sioux Falls. It is my understanding that Bishop Flores was aware of his past and did give him limited ministry with priests.... I trust that you would assign him to the kind of ministry where he would not have regular involvement with young people and where he would

not be overworked.... From the reports I have received, Father MacArthur has had a good track record in recent years – working with the Oblates in the Brownsville area and in Africa as well as working in San Antonio."

d. On or about July 2, 1992, Bishop Dudley wrote to Bishop Michael D. Pfeifer of the Diocese of San Angelo, Texas regarding the importance of protecting priests in light of the potential for litigation and again acknowledged his awareness of defendant MacArthur's propensity for sexual abuse: "Bishop Michael, in light of our Bishops' Executive Meeting at Notre Dame on the matter of sexual misconduct among clergy, I do believe it is well to keep close and supportive contact with our brother priests who may have had difficulties in the area of sexual misconduct. Due to the incredible increase of litigations and allegations of clergy sexual misconduct in the press, some of the victims of 20 or 30 years ago surface and express their concerns, fears and pain. Just a few days ago, a woman called me expressing such fear and worry that Father Bruce might abuse some child as she was abused."

(23) In approximately August, 1992, defendant MacArthur was allowed to quietly retire but remains a priest and has been allowed to minister until recently.

(24) Bishop Dudley granted defendant MacArthur's request for retirement and attempted to comfort defendant MacArthur about the scandal caused by sexual abuse in the church: "The prominent publicity given to many of the alleged sexual abuse cases must disturb you very much as it does all of us. Please be assured of my prayers that the Lord will grant you courage and strength to persevere in your present close relationship with the Lord Jesus."

(25) On or about September 15, 2002 defendant MacArthur wrote to Plaintiff admitting that he sexually abused her, stating: "I owe you much more than an apology . . . I find it very difficult to use the word apology for it is neither adequate or suitable to my heinous acts. I wish to acknowledge my immoral and grevous [sic] act with you not only because they are contrary to human nature, but also, because, I am a priest and I took you away from Christ the High priest."

(26) Defendant MacArthur has admitted that he abused other children in the Diocese of Sioux Falls and other parts of the country.

9

(27)    As a direct result of the sexual molestation by defendant MacArthur and the additional intentional, reckless and negligent conduct of the defendant Dioceses and Bishop Dudley, and each of them as alleged herein, Plaintiff has suffered and will continue to suffer severe and permanent emotional distress, embarrassment, loss of self-esteem, loss of faith, loss of trust, disgrace, humiliation, psychological disability and loss of enjoyment of life, has sustained wage loss and loss of earning capacity and will continue to incur expenses for psychological treatment, therapy and counseling.

(28) Circumstances including the nature of the sexual molestation, the trust required of parishioners like Plaintiff and her family by the defendant Dioceses, the power and authority defendant MacArthur asserted over the minor Plaintiff as a result of his position as a Roman Catholic parish priest and the Plaintiff's tender years at the time of the sexual abuse, caused plaintiff to develop various psychological coping mechanisms including developing great guilt, shame, embarrassment, self-blame, denial, repression and dissociation from her experiences. Because of these psychological coping mechanisms, Plaintiff was unable to perceive or know the existence or nature of her psychological injuries and/or their connection to the sexual molestation perpetrated upon her by defendant MacArthur.

## COUNT ONE:  SEXUAL ABUSE
### (Defendant MacArthur)

(29)    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count.

(30) From approximately 1965 to 1970 defendant MacArthur without provocation or justification engaged in numerous illegal, harmful and offensive sexual contact upon the person of Plaintiff, who was a minor.

(31)    Plaintiff also suffered emotional and spiritual abuse by defendant MacArthur as a result of his sexual molestation of her.

(32)  The abuse of Plaintiff was undertaken while defendant MacArthur was a managing agent of the defendant Dioceses and while defendant MacArthur was under the direct control and supervision of the defendant Dioceses and Bishop Dudley.

(33)  As a result of defendant MacArthur's abusive treatment, Plaintiff has suffered substantial personal injury and damages described herein.

## COUNT TWO:  FRAUD AND CONCEALMENT
### (Defendant Dioceses and Bishops)

(34) Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count.

(35)  On information and belief, all defendants had actual or constructive knowledge that defendant MacArthur was sexually abusive toward children and parishioners prior to Plaintiff's abuse.

(36)  On information and belief, the defendant Dioceses aided and abetted the acts complained of herein and conspired to conceal material facts; to violate the civil rights of Plaintiff and other parish children to be free from sexual, physical and emotional abuse; to prevent public knowledge of dangerous priests; to prevent criminal prosecution; to avoid disgrace and scandal; to maintain their status and their fundraising abilities; and to retain the active service of priests regardless of their qualifications.

(37)  Upon repeated discoveries of the defendant MacArthur's sexual molestation of children, the defendant Dioceses systematically transferred defendant MacArthur and accepted him for placement at new parishes without reporting the criminal sexual misconduct to victims, victims' families, law enforcement authorities or revealing to new parishioners defendant MacArthur's history and propensities for sexual molestation of youth, held defendant MacArthur out to the new parishes as a competent, fit and moral Roman Catholic priest and expressly or impliedly assured reporting parents that the church would responsibly deal with defendant MacArthur.

(38) Defendant Dioceses and defendant Bishops, by holding themselves out as shepherds and leaders of the Roman Catholic Church, solicited and accepted a fiduciary position of empowerment over the minor Plaintiff.

(39) Defendant Dioceses and defendant Bishops knew that parishioners would rely upon their representations of defendant MacArthur's fitness and would obey him as a priest.

(40) By holding defendant MacArthur out as a qualified Roman Catholic priest, and by undertaking the religious instruction and spiritual and emotional guidance of the minor Plaintiff, defendants Diocese and defendant Bishops entered into a fiduciary relationship with the minor Plaintiff which prevented the then minor Plaintiff from effectively protecting herself.

(41) As fiduciaries of Plaintiff, the defendants Dioceses and the defendant Bishops had a duty to timely and accurately obtain and disclose information relating to sexual misconduct and other inappropriate behavior of defendant MacArthur.

(42) Plaintiff reasonably relied on the defendants Dioceses' and defendant Bishops' representations of MacArthur's fitness as a priest, teacher and spiritual leader.

(43) Plaintiff justifiably relied upon the defendant Dioceses' and defendant Bishops' silence on the subject of sexual misconduct and other inappropriate behavior of defendant MacArthur.

(44) Plaintiff justifiably relied upon the defendant Dioceses' and defendant Bishops' misrepresentations that defendant MacArthur should be trusted and obeyed.

(45) Defendants Dioceses' and defendant Dudley's concealment of material facts and failure to disclose information relating to the sexual misconduct and other inappropriate behavior of defendant MacArthur to Plaintiff was intentional.

(46) As fiduciaries of Plaintiff, the defendants Dioceses had a duty to disclose to Plaintiff and others the wrongful nature of the abuse, but instead used Plaintiff's dependency and innocence as a child to prevent her from recognizing that the abuse was wrongful. The defendant Dioceses and defendant Bishops instead enforced the secrecy around the abuse and otherwise failed to provide Plaintiff with appropriate counseling or mental health care.

12

(47)  Because of the defendants Dioceses' fraudulent concealment and representations about defendant MacArthur's propensities to abuse children, Plaintiff  lacked actual or constructive knowledge of the factual and legal basis for this lawsuit.

(48)  Plaintiff, despite her exercise of due diligence, was prevented from discovering these causes of action set forth herein, because of the defendants Dioceses' conduct.

(49)  As a direct result of defendant Dioceses' fraud, Plaintiff was sexually and emotionally abused and has been damaged as alleged herein.

## COUNT THREE:  NEGLIGENCE
### (Defendant Dioceses and Bishops)

(50)  Plaintiff incorporates all paragraphs of this Complaint as if fully set forth  under this count.

(51)  Defendant Dioceses and defendant Bishops appointed, assigned and encouraged defendant MacArthur to hold  himself out as a qualified Roman Catholic priest and as a shepherd and leader of the Roman Catholic Church.

(52)  Defendant Dioceses and defendant Bishops required obedience to their rules and their appointed priests in the religious instruction and spiritual and emotional guidance of their parishioners, including the minor Plaintiff,  thereby entering into a fiduciary relationship with the minor Plaintiff.

(53)  As a result of Plaintiff being a minor, and by  undertaking the care and guidance of the then vulnerable minor Plaintiff, the defendant Dioceses and defendant Bishops held a fiduciary position of empowerment over Plaintiff.

(54)  This empowerment prevented the then minor Plaintiff from effectively protecting herself.

(55)  Defendant Dioceses and defendant Bishops had a duty to protect the Plaintiff from sexual  and emotional abuse at the hands of its priest.

(56) Defendant Dioceses and defendant Bishops knew or should reasonably have known of defendant MacArthur's dangerous and exploitative propensities as a child sexual abuser and despite such knowledge, the defendant Dioceses and defendant Bishops negligently retained, assigned and otherwise failed to provide reasonable supervision of defendant MacArthur to prevent him from abusing the Plaintiff.

(57) Defendant Dioceses and defendant Bishops failed to protect Plaintiff from sexual or emotional abuse at the hands of defendant MacArthur.

(58) As a direct result of the defendant Dioceses' and defendant Bishops' breach of their fiduciary duties, and Plaintiff's reasonable reliance, Plaintiff has suffered the injuries and damages described herein and the defendant Dioceses and defendant Bishops' are equitably estopped from certain affirmative defenses.

(59) As a direct result of defendant Dioceses' and defendant Bishops' negligent conduct, Plaintiff has suffered the injuries and damages described herein.

WHEREFORE, Plaintiff demands judgment against Defendants individually, jointly and severally in an amount to be determined at trial, plus costs, disbursements, reasonable attorneys fees, punitive damages, interest, and such other relief that the Court deems just and equitable.

Dated this _21_ day of May, 2003.

REINHARDT AND ANDERSON

By: Jeffrey R. Anderson,
E-1000 First National Bank Bldg.
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 227-9990

and

Rick Johnson
Stephanie E. Pochop
Johnson Eklund Nicholson & Peterson
P.O. Box 149
Gregory, South Dakota 57533

ATTORNEYS FOR PLAINTIFF

**DEMAND IS HEREBY MADE FOR A TRIAL
BY JURY TO A TWELVE-PERSON JURY**

15